# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# DISTRICT OF MARYLAND
NORTHERN DIVISION
TOWER II, 9th FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-3976
TOLL FREE: (855) 213-8450

JAMES WYDA
FEDERAL PUBLIC DEFENDER

CHRISTINA WONG
ASSISTANT FEDERAL PUBLIC DEFENDER

July 9, 2024

Magistrate Judge J. Mark Coulson
United States District Court – District of Maryland
101 W. Lombard Street
Baltimore, MD 21201

      Re:    *United States v. Talha Ahmed*
             Case No. 24-MJ-1594-JMC

Dear Judge Coulson:

     I write in advance of Talha Ahmed's detention hearing, which is scheduled for tomorrow, Wednesday, July 10, 2024. Mr. Ahmed is before this Court on a two-count indictment for attempted production of CP (18 U.S.C. § 2251(a), (e)) and attempted online enticement of a minor (18 U.S.C. § 2422(b)), for which he has been detained since his arrest at home in Catonsville, Maryland on July 1, 2024. Mr. Ahmed's indictment arises out of the Eastern District of Washington, the area where the complainant in his case resides, but which Mr. Ahmed has no connection to.

     Mr. Ahmed now seeks release to his parents' home in Catonsville, the only residence he knows, on the strictest possible conditions: home confinement with 24/7 location monitoring, the supervision of a third-party custodian, and restricted access to electronic devices plus electronic monitoring software.

**I.**      **While a "presumption" of detention applies in this case, it can be easily rebutted.**

     In federal criminal cases, "[L]iberty is the norm, and detention prior to the trial . . . is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987). The Bail Reform Act was meant to authorize detention only for a narrow set of people: those who are <u>highly</u> dangerous or pose a <u>high</u> risk of absconding. *Salerno*, 481 U.S. at 747, 750 (emphasis added). Mr. Ahmed fits neither of these categories, and thus, under both the spirit of the Bail Reform Act and the letter of the law, this Court should release Mr. Ahmed to home confinement and location monitoring at his parents' home.

While the Government emphasizes that a "presumption" of detention applies in Mr. Ahmed's case based on the charges he faces[1], it fails to mention that this "presumption" is rebuttable. The "presumption" merely places "a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (quoting *United States v. Alatishe*, 768 F.2d 364, 371, 247 U.S. App. D.C. 247 (D.C. Cir. 1985)) (emphasis added). But this burden of production is limited – and thus the "presumption" easily rebutted – as Mr. Ahmed need only present some credible evidence to show he is not a flight risk or a danger to the community in order to rebut it. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (the burden of production is "not a heavy one to meet"); *United States v. Perry*, 788 F.2d 100 (3d Cir. 1986). The presumption can be rebutted by "any evidence favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family, and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in § 3142(g)(3) [history and characteristics of the defendant]." *Dominguez*, 783 F.2d at 707.

Meaningfully, once the "presumption" has been rebutted, it can no longer be considered by the Court, and the Court must continue with its ordinary detention analysis as if the "presumption" never existed. And in every detention hearing, the Government bears the ultimate burden of persuasion. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) ("Even in a presumption case, the government retains the ultimate burden of persuasion.") This means the prosecution needs to prove that no combination of conditions exists that will reasonably assure Mr. Ahmed's appearance, by a preponderance of the evidence, and that no combination of conditions exists that will reasonably assure community safety, by clear and convincing evidence. *See United States v. Himler*, 797 F.2d 156 (3d Cir. 1986) (standard for danger to community is set by statute; standard for risk of flight is set by caselaw); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985) (Government faces the heavy burden of clear and convincing evidence to show the defendant is a danger). And it is worth noting that the standard of "reasonably assure" does not require an ironclad guarantee. *See United States v. Orta*, 760 F.2d 887 (9th Cir. 1985) ("reasonably assure" does not mean an ironclad guarantee).

In other words: if there are questions as to flight or safety, then the Government must show that the federal courts and U.S. Probation, with all available supervision conditions and powers, can impose no conditions of release that will reasonably assure appearance and safety. *See* 18 U.S.C. § 3142(c). Here, there are conditions that will reasonably assure Mr. Ahmed's appearance and safety: 24/7 home confinement under the supervision of a third-party custodian, location monitoring, and electronic device monitoring.

Furthermore, failure to appears are rare in federal court: nearly everyone released before trial appears in court and does not reoffend. In 2019, 99% of released federal defendants nationwide appeared for court as required, and over 98% did not commit new crimes.[2] And this

---

[1] *See* Government detention letter at 1.
[2] AO Table H-15 (Dec. 31, 2019), available at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[3] In other words, when release increases, crime and flight do not.

## II.     Mitigating evidence about Mr. Ahmed overcomes the presumption.

i. <u>Mr. Ahmed was questioned and his devices were searched during a home raid by HSI in March 2024, and he *still* didn't run, despite knowing he was in trouble.</u>

Mr. Ahmed was taken by surprise on March 18, 2024, when law enforcement officers from Homeland Security Investigations showed up at the front door of the Ahmed family's Catonsville home.[4] HSI made contact with Fozia Ahmed, Mr. Ahmed's mother, when no one answered the door, and Fozia called Mr. Ahmed – who hadn't heard the door, as he was sleeping – and informed him that officers were there to speak with him.

Mr. Ahmed, despite knowing that he was in trouble, was fully cooperative with law enforcement. He voluntarily consented to a search of his cell phone, providing the passcode to it and allowing the HSI officer to . He voluntarily consented to a recorded interrogation with HSI, answering all of their questions. And even when the HSI officer asked him specific questions about the very allegations in the instant indictment – questions about online interactions he had with an 11-year-old girl on Snapchat – he continued speaking with the officer.

After the HSI officer left his house, Mr. Ahmed <u>knew</u> he was in hot water, so much so that he asked his mother to refrain from telling his father about the search and interrogation. But what Mr. Ahmed <u>didn't</u> do was run. Over the past 4 months, he had a golden opportunity to flee Maryland, to take a flight to Pakistan (as the Government suggests he might do if he were released now), to drive into rural parts of this country and try to escape what he knew were pending criminal charges – and yet he did not.

The fact that Mr. Ahmed didn't flee over the past 4 months, at the most opportune moment he could've done so – before he was under indictment, before he was not under the supervision of the court system, when he did not have a probation officer to report to – is telling. It demonstrates that Mr. Ahmed was never a flight risk, and is even less likely to be one now if released on 24/7 lockdown with a third-party custodian, location monitoring, and electronic devices monitoring.

ii.     <u>Mr. Ahmed's deep ties to Maryland and limited finances keep him here.</u>

Even if Mr. Ahmed had wanted to run back in March, he would not know where to go, as Maryland is the only home he has even known. Mr. Ahmed and his family are firmly rooted in the Maryland community. Mr. Ahmed was born in Towson, lived in Catonsville for his entire life, and graduated from Landsdowne High School in 2015.[5] Following graduation, Mr. Ahmed worked as a sales associate at the Fossil accessories store at the Columbia Mall from 2016 until January

---

[3] *See* Alison Siegler and Erica Zunkel, "Rethinking Federal Bail Advocacy to Change the Culture of Detention," *The Champion* (Journal of the National Association of Criminal Defense Lawyers): May 14, 2020, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3601230.
[4] *See* Government detention letter at 5.
[5] *See* Pretrial Services Report at 1-2.

2024.[6] In December 2021, he was hired as an Assistant Manager at the Gold Valley jewelry store in Woodlawn, and has been working there 6 days per week, 9 hours per day since.[7]

Mr. Ahmed's parents, Mohammad and Fozia, are both American citizens, as are their three children. Mohammad Ahmed, who is 64 years old, has lived in Maryland since 1987, for a total of 37 years. Fozia Ahmed, who is 56, has lived in the United States since she was 8 years old, and has been a Maryland resident since she was 20 years old. Mr. Ahmed's 29-year-old sister, Zaynub, was, like Mr. Ahmed, born in Maryland; she is currently attending nursing school and also works at Sephora. The Ahmed family has lived together in Catonsville since 1993, and they own the home they currently live in.

The Ahmeds' career paths demonstrate their deep connections to the Maryland community. Fozia has worked in nursing for years; most recently, she was employed as a Registered Nurse at Sheppard Pratt psychiatric hospital from 2006-2018, then earned her Nurse Practitioner degree after attending night school and has been working as an NP at Tranquility Woods Addiction Treatment Center in Pasadena, Maryland for the past 6 years. Mohammad currently serves as the Director of Program Management at Gaudenzia, but previously served as the Director of Substance Abuse Programs for the Baltimore City Jails before those services were cut[8].

The Government seems to suggest that simply because Mr. Ahmed is ethnically Pakistani and traveled there once in 1999 (at age 2) and once in 2021 (to reconnect with his heritage and meet extended family members) that he may flee to Pakistan, with which the United States does not have an extradition treaty.[9] This racially-charged analysis should hold no weight in this courtroom. Mr. Ahmed is an American through-and-through: he was born in the United States; has never lived anywhere but Catonsville, Maryland; has dozens of immediate and extended family members both in Maryland and elsewhere in the United States; and has no close relationships with any relatives in Pakistan. He does not speak, read, or write Urdu, the national language of Pakistan. And any wariness about his "active passport" can easily be squashed with the simple act of surrendering his passport to this Court.

Moreover, Mr. Ahmed's parents themselves have not traveled to Pakistan in over 14 years, as the Ahmed family no longer has close relatives who live there. Mohammad's parents are deceased, and Fozia's mother lives in Catonsville, just a few blocks away from the Ahmed family home. Fozia's great-aunt and cousins all also reside in Maryland. And her brother and sister live in Texas. As Fozia explains, "We have no reason to visit Pakistan – all of our living close relatives live in the United States." Regardless, these limited ties Mr. Ahmed has to Pakistan do not mean there are no conditions that could reasonably assure his appearance in court.

    iii.    <u>Mr. Ahmed has zero criminal history.</u>

---

[6] *See id.* at 2.
[7] *See id.*
[8] *See* Kelly Brewington, "Jail treats addicts with acupuncture," *The Spokesman-Review* (reprinting *Baltimore Sun* article), March 31, 2009, available at https://www.spokesman.com/stories/2009/mar/31/jail-treats-addicts-with-acupuncture/.
[9] *See* Government detention letter at 6.

Mr. Ahmed has never before been arrested or convicted of any crime; the allegations regarding his conduct from over three years ago are the only ones that he has ever faced. This factor demonstrates that Mr. Ahmed is not a danger to the community and counsels in favor of release.

      iv.    <u>The allegations, which are limited to at most an 8-day span of messages exchanged in May 2021, are over 3 years old, and Mr. Ahmed has not been accused of any other crime since that time.</u>

While they are serious, the allegations in this case are both stale and very limited in scope: the conduct alleged is from 3 years ago, in May 2021, and spanned at most an 8-day period, according to the indictment. There is no evidence and no allegation that Mr. Ahmed engaged in concerning behavior other than the specified conduct during the past 3 years. The staleness of the charges also begs the question of why the U.S. Attorney's Office in Eastern Washington waited so long to indict this case, as the Government states the complainant and her mother reported the allegations on May 28, 2021 – mere days after the messages in question were allegedly sent[10].

The weight of the evidence is "the least important of the various factors" that bear on this Court's detention analysis. *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). However, regarding the specifics of the allegations, the Government has not proffered reliable evidence showing Mr. Ahmed knew the age of the complainant at the time he was asking her to provide sexually explicit content. The Government claims the complainant told Mr. Ahmed she was 11 or 12 years old (she was 11), but has provided no proof of this – no text messages, Snapchat exchanges, or other evidence – other than the complainant's own statement.[11] Notably, the complainant and Mr. Ahmed met on the computer game "Party In My Dorm," which explicitly bars in its Terms of Use any players under the age of 17 years old: "Any players found to be under the age of 17 will have their accounts immediately disabled . . . You must be at least 17 years of age or older to use Party In My Dorm. Party In My Dorm is not designed for children under the age of 17. If you are under the age of 17 you may not use Party In My Dorm, you must uninstall the application and discontinue use of any of its features. If we discover that a child under 17 has provided us with personal information, we will delete such information from our systems."[12] Mr. Ahmed may have engaged in sexual conversations with the complainant, but the evidence that he knew she was underage is far from airtight.

      v.    <u>3 years after the alleged conduct, Mr. Ahmed is not a danger to the community.</u>

As previously mentioned, there are no allegations that Mr. Ahmed has engaged in any other questionable conduct since those 8 days in May 2021. Law enforcement searched his phone in April 2024 and found no other evidence of other crimes, and the Government has not put forth any allegations besides those contained in the indictment. That is because Mr. Ahmed has completely transformed his life since then.

---

[10] *See* Government detention letter at 2.
[11] *See* Government detention letter at 5 (reporting that "during the police forensic interview of MG, she stated that she had either told Ahmed she was 11-years-old or around that age").
[12] *See* "Party In My Dorm," General Terms of Use, available at https://www.partyinmydorm.com/tos.html.

While Mr. Ahmed does not admit to the charged conduct, he does admit that around the time of the allegations, he was deeply depressed and in the throes of addiction. How Mr. Ahmed arrived at that place is a devastating story: when Mr. Ahmed was 7 years old, he was sexually abused by a cousin while he was at his grandma's house during a school holiday. Then, when Mr. Ahmed was 12 years old, his oldest sister's husband sexually abused him and his middle sister. The abuse went on for nearly the entire year Mr. Ahmed's brother-in-law lived with the family, and even though Mr. Ahmed told his parents about it, his father didn't believe him – until his middle sister told their parents she too was being abused. His mother took his middle sister away and refused to return until Mr. Ahmed's brother-in-law had been ejected from the home. But to this day, Mr. Ahmed's sister is still married to him and refuses to believe he engaged in that behavior, which has created a rift among the family.

In order to cope with the pain – of being repeatedly sexually abused, and of living with a parent who didn't believe the abuse was happening (and still doesn't believe it happened) – Mr. Ahmed, around age 18, began smoking marijuana. Within a year or two, he was also drinking heavily and using Xanax. And from ages 21 to 24, between the years 2018 and 2021, Mr. Ahmed was on a binge of marijuana, alcohol, Xanax, and food, so much so that the period of his life was a "blur" to him. He dropped out of college, ballooned to 300 pounds, and spent all day drinking and smoking, only working a dead-end job as a sales associate at Fossil 2-3 days per week. By Mr. Ahmed's account, he was drinking two handles of Ciroc and smoking 6-10 blunts per day, all mixed in with Xanax pills. And by Mr. Ahmed's parents' account, they were worried about their son's trajectory in life, but didn't realize where his depression stemmed from.

However, after a miserable summer, Mr. Ahmed decided he needed to make changes in his life. During the fall of 2021, he went on the keto diet and lost 90 pounds. He also began looking for a better job, and eventually found one working as a jeweler at Gold Valley, where he was paid a salary and afforded benefits like health insurance. And he slowly began decreasing his use of substances, starting with the Xanax pills, so each passing day was less hazy.

Now, Mr. Ahmed is sober, save for drinking alcohol socially every 4-5 months, and smoking 1 blunt of marijuana daily, to combat his anxiety. He has worked full-time at Gold Valley for 2.5 years and rose to the Assistant Manager position, working six days per week. And he got a gym membership and works out every morning before work. Mr. Ahmed credits his success with making these changes in his life to God – he also regularly worships at the Islamic Society of Baltimore mosque in Catonsville. In sum, the person who allegedly requested sexual photos and videos back in 2021 is completely different from the person who stands before this Court today. This Court need not have concerns about the danger Mr. Ahmed poses to the community in 2024, over three years removed from the allegations in this case.

**III.   Conditions exist that will reasonably assure community safety and appearance.**

Again, the Government needs to prove that no combination of conditions exists that will <u>reasonably</u> assure Mr. Ahmed's appearance, by a preponderance of the evidence, and that no combination of conditions exists that will <u>reasonably</u> assure community safety, by clear and convincing evidence. They cannot do that here. Mr. Ahmed suggests the following conditions, which are the strictest possible available to this Court:

- Remain in the custody of a third-party custodian, Fozia Ahmed, who agrees to a) supervise Mr. Ahmed in accordance with all the conditions of release; b) use every effort to assure Mr. Ahmed's appearance at court dates; and c) notify the court immediately if Mr. Ahmed violates any condition of release or disappears;
- Live at a residence approved by the U.S. Probation Officer supervising his release;
- Inform the Court, defense counsel, and the Government in writing before changing his address or phone number;
- Remain in 24-hour-a-day lockdown at the approved residence at all times except for medical necessities, attorney visits, court appearances, or other specific activities that must be approved by the Court;
- Request permission first from his Probation Officer if he needs to leave the home for medical necessities, attorney visits, court appearances, or other specific activities that must be approved by the Court;
- Appear either in-person or virtually as required by the Magistrate and District Courts in the Eastern District of Washington;
- Submit to location monitoring technology: i.e., wear an ankle monitor that alerts the Probation Officer if he leaves his approved residence without prior permission;
- Avoid contact with anyone who is or may become a victim or potential witness, including any person identified in writing by the Government;
- Install computer monitoring software on his phone and laptop computer, and restrict access with biometric markers and/or passwords for all other devices in the home belonging to family members;
- Engage in substance abuse treatment, if U.S. Probation deems it necessary;
- Engage in mental health treatment, if U.S. Probation deems it necessary;
- Surrender his passport for the duration of this case;
- Surrender his lawfully-owned firearm for the duration of this case.

Notably, Pretrial Services deemed Mr. Ahmed's mother an acceptable third-party custodian and the family residence an acceptable release address.[13] Fozia Ahmed is also willing to answer any questions this Court has about her suitability as a third-party custodian. While the Government questions her ability to effectively supervise Mr. Ahmed since he was living with her at the family residence at the time the allegations arose[14], Mr. Ahmed's mother was completely unaware about Mr. Ahmed's online activity then, and is hyper-aware of it now. While she cannot completely control the interactions Mr. Ahmed has online, that is not the standard – the question this Court must ask is whether conditions exist that <u>reasonably</u> assure the safety of the community, and the existence of a third-party custodian who will be independently monitoring Mr. Ahmed serves that function.

Another condition the Court can use to reasonably assure community safety is restricting Mr. Ahmed's access to electronic devices in the home and installing electronic monitoring software on his personal devices. Fozia Ahmed has informed undersigned counsel that many of the devices in the home are protected by both biometric information (face scan or fingerprint) and

---

[13] *See* Pretrial Services Report at 1.
[14] *See* Government detention letter at 6.

passcode, and Mr. Ahmed has never accessed those devices. Furthermore, at least three devices have additional protections, because they are phones and computers that Fozia and Mohammad Ahmed use for their work in the healthcare profession, and Mr. Ahmed has never accessed those devices. As for the devices Mr. Ahmed would have access to – two smart TVs, his personal laptop, and a PlayStation – those can either be installed with electronic monitoring software or restricted to prevent Mr. Ahmed from accessing them at all. (Mr. Ahmed's cell phone was seized during his arrest, and if he obtains a new one, electronic monitoring software can also be installed on it.) But it bears mentioning again that in the past 3 years, since the allegations at issue, Mr. Ahmed has not engaged in any online interactions that led to an indictment. The risk posed to the community by Mr. Ahmed's release is extremely low, and even that low risk can be mitigated with the installation of electronic monitoring software or complete restrictions on device access.

Finally, on a practical note, while Mr. Ahmed and his family lives a humble life and don't have the resources to hire a private attorney or facilitate an escape to another country, they do have the means to ensure Mr. Ahmed will appear – either virtually or in-person – for court in the Eastern District of Washington. Undersigned counsel has conferred with attorneys from the Federal Defenders of Eastern Washington and Idaho, the office that will be handling Mr. Ahmed's case once his proceedings in Maryland end, and those attorneys confirmed that the District Court in Eastern Washington will accommodate out-of-custody clients who live in different states with virtual appearances.[15]

\*     \*     \*

24/7 home confinement, 24/7 location monitoring, a third-party custodian, electronic monitoring software, and a surrendered passport: all of these conditions, in addition to the many others suggested to this Court, will reasonably assure the safety of the community and Mr. Ahmed's appearance for any future court dates in Eastern Washington. The strictest of conditions may not be entirely necessary for a defendant who was tipped off about a looming prosecution 4 months ago and still did not run, and who has lived a law-abiding life since the allegations in May 2021, but they should certainly alleviate this Court's concerns about danger and flight. Mr. Ahmed requests his immediate release under these conditions.
.

        Sincerely,

        /s/
        Christina Wong (NY# 5528146)
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        100 S. Charles Street, Tower II, Floor 9
        Baltimore, MD 21201

---

[15] AFPD Craig Webster, of the Federal Defenders of Eastern Washington and Idaho, informed undersigned counsel that he has a client who resides in the Chicago area and is pending trial in the Eastern District of Washington. Coincidentally, undersigned counsel used to work as an AFPD in Eastern Washington and had several clients who resided in California but periodically flew to Eastern Washington for court appearances and meetings, or appeared virtually with the consent of the court. Suffice it to say that the District of Eastern Washington has historically been willing to accommodate out-of-state defendants.

Telephone: 410-962-3962

Cc (via email): Jared Bein, AUSA
Manisha Garner, USPO